NUSEKABEL et al., Appellees,

v.

**CINCINNATI PUBLIC SCHOOL EMPLOYEES
CREDIT UNION, INC. et al., Appellants.**

[Cite as *Nusekabel v. Cincinnati Pub. School Employees
Credit Union, Inc.* (1997), 125 Ohio App.3d 427.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–970069.

Decided Dec. 26, 1997.

428

*John W. Hauck,* for appellees.

*Kircher, Robinson, Newman & Welch* and *Thomas J. Kircher,* for appellant Cincinnati Public School Employees Credit Union, Inc.

*Furnier, Thomas, Rosenberg & Herfel, L.L.P.,* and *Gary L. Herfel,* for appellant Carlisle Crane & Excavation Co.

*Fay D. Dupuis,* City Solicitor, and *Stephen J. Fagel,* for appellant city of Cincinnati.

———————

PAINTER, Presiding Judge.

In this case, the city of Cincinnati's failed attempt to create a subway system in the 1920s haunts a present-day real-estate tangle. Inattention by later parties has created a further mess concerning a parking lot for a building that was built before the automobile's invention. And the trial court's well-intentioned action has woven a further and worse tangle. We must cut the knot.

## I. The History

In September 1988, Edward and Carol Nusekabel, the plaintiffs-appellees, acquired title to 1009 Marshall Avenue, on which an apartment building extends the property's entire forty-foot width in an east-west direction along Marshall. The property measures approximately one hundred fifty feet north to south. Behind the apartment building is a parking lot, which was used continuously by the building's tenants and previous owners since at least 1959—automobiles having come into use after the building's construction. Because the building occupies the entire frontage of the lot on Marshall Avenue, the parking lot behind the building is landlocked, unless access can be gained over property belonging to someone else—a fact not creating problems before cars.

Before the Nusekabels bought the property, they did not investigate the land records and just assumed that a right of way or easement existed over the neighboring property because for years the building's tenants and previous owners had driven over a concrete roadway and gravel path to reach the parking lot from Marshall Avenue. Defendant-appellant city of Cincinnati owned this neighboring property, to the Nusekabels' west, since 1921, when the city acquired it for a doomed and never-completed subway project.

In 1986, the city conveyed a triangular piece of this property to defendant-appellant Carlisle Crane and Excavation Company. This triangular piece of property shares almost all the Nusekabels' western border. Viewed on the recorder's plat, the remaining property, which is still owned by the city, appears to border the Nusekabels' property only on Marshall Avenue.

Evidently, Carlisle developed the property for defendant-appellant Cincinnati Public School Employees Credit Union, to which Carlisle sold the property in 1987. The credit union used this property for a new office building and constructed an access driveway from the building to Marshall Avenue over some of the land that had been used as access to the apartment building's parking lot. The credit union put up asphalt curbs on the driveway and shrubs along the easterly border of the driveway, prohibiting the apartment building's tenants and owners from reaching their parking lot.

Before the credit union blocked this access, the apartment building's tenants and prior owners had reached the parking lot via a concrete roadway that was partially on property now owned by the credit union and partially on property still owned by the city, and that adjoined Marshall Avenue. This concrete roadway connected to a gravel path that traversed the property now owned by the credit union and led into the apartment building's parking lot.

The apartment building's prior owners called the concrete roadway "Cormany Street," but on the recorder's plat it appears as "Cormany Avenue." Cormany Avenue is a dead-end parcel that does not border the Nusekabels' property, but runs along the city's southern border and part of the credit union's southern border and is accessible only from the east by Stephens Street, which is no longer in existence. From an aerial photograph dated 1966, it appears that a concrete road did indeed run from Marshall Avenue, over what is now property owned by both the city and the credit union and also on the parcel platted as Cormany Avenue.

The Nusekabels filed suit, claiming that they were entitled to a prescriptive easement over the parcels owned by the city and the credit union. The Nusekabels and the building's tenants were blocked from the parking lot, and also, of course, could not take the subway. The trial court granted summary judgment to the Nusekabels and proceeded to give them what amounts to an unrecordable parcel of property, which still does not abut theirs and gives them no more than they had—which was nothing—but undoubtedly clouds the city's and the credit union's titles to their properties.

The defendants-appellants bring two assignments of error. The supporting legal arguments for each party are fundamentally the same, the only question among them being who would be liable for a judgment based on the property transfers that were subject to warranties in the relevant deeds. Our disposition of this case renders that question moot.

## II. The "Vacation" of Cormany Avenue

In the first assignment, the defendants-appellants assert that the trial court erred in granting summary judgment to the Nusekabels. We agree.

■ Appellate courts perform a *de novo* review of a summary judgment.[1] Under Civ.R. 56(C), a motion for summary judgment is properly granted if the court, upon viewing the evidence in a light most favorable to the party against whom the motion is made, determines that (1) there are no genuine issues as to any material fact, (2) the movant is entitled to a judgment as a matter of law, and (3) the evidence is such that reasonable minds can come to but one conclusion and that conclusion is adverse to the opposing party.[2] Our review entails a determination of whether the trial court properly granted summary judgment to the Nusekabels, entitling them to one half of Cormany Avenue.

The trial court determined that a prescriptive easement could not be acquired on municipal streets and alleys. But the court then concluded, even though the Nusekabels' evidence supporting summary judgment was to the contrary, that before the city sold the property to Carlisle, Cormany Avenue was a street open and dedicated to public use that extended to Marshall Avenue. Again from whole cloth, the trial court concluded that the city had vacated Cormany Avenue. The trial court then granted half of the fee simple for Cormany Avenue to the Nusekabels, thus providing them with access to their parking lot.

■ The trial court apparently wished to fashion an equitable remedy allowing the Nusekabels to use their parking lot, but in the process it jettisoned all the applicable facts and law. First, the trial court determined that Cormany Avenue extended to Marshall Avenue, although, on a plat submitted as evidence, Cormany Avenue bordered the city's and the credit union's properties on its northern border and did not extend to Marshall Avenue. Whether Cormany Avenue was a street dedicated to public use was a factual question improperly decided by the trial court—especially because the Nusekabels actually argued that the street was not open or dedicated to public use. Undisputedly, the city did not statutorily dedicate Cormany Ave. The question, necessarily turning on the facts, would be whether a common-law dedication of the concrete roadway extending to Marshall Avenue had occurred. Cormany Avenue's exact boundaries were thus still factual questions improperly decided on summary judgment.

■ But most important, and ignored by the trial court, Cormany Avenue, even if it extended to Marshall Avenue and was subject to common-law dedication, would not have bordered the Nusekabels' property. This is clear not only from the plat, but from the affidavits of the apartment building's former owners, Gene and Elizabeth Mueller, and from Edward Nusekabel's deposition. Gene

---

1. *Smiddy v. The Wedding Party, Inc.* (1987), 30 Ohio St.3d 35, 30 OBR 78, 506 N.E.2d 212; *Koos v. Cent. Ohio Cellular, Inc.* (1994), 94 Ohio App.3d 579, 641 N.E.2d 265.

2. *State ex rel. Howard v. Ferreri* (1994), 70 Ohio St.3d 587, 639 N.E.2d 1189; *Temple v. Wean United, Inc.* (1977), 50 Ohio St.2d 317, 4 O.O.3d 466, 364 N.E.2d 267.

Mueller indicated that Cormany Avenue did not border the Nusekabels' property, stating that "there was access from the side road [Cormany Avenue] to the parking lot behind 1009 Marshall Avenue for this purpose. The access road was gravel." Elizabeth Mueller also stated in her affidavit that a gravel road connected Cormany Avenue with the parking lot: "The connecting road from the side street [Cormany Avenue] to our parking lot, crossing the lot line, was gravel." And Edward Nusekabel affirmed this by stating that when he visited the property in the early 1980s, he got to the parking lot by driving on Cormany Avenue and a path from Cormany Avenue: "It was a little bit of everything. It was a little blacktop, a little concrete, a little gravel, and a little grass. It was just a path."

The Muellers' and Nusekabel's statements, combined with the plat, clearly show that even if Cormany Avenue in fact extended to Marshall, it did not border the Nusekabels' property. The property now owned by the credit union was between the Nusekabels' property and what was purportedly Cormany Avenue, and the gravel road connecting Cormany and the parking lot traversed this property now owned by the credit union.

The trial court erred in granting half of the fee simple for Cormany Avenue (the precise meaning of which is beyond the comprehension of both the parties and this court) to the Nusekabels, even if the evidence supported a common-law dedication of Cormany Avenue and the city had in fact vacated it. There was no fee to grant because the Nusekabels' property did not share an extended border with Cormany Avenue, even if Cormany Avenue in fact extended to Marshall Avenue.

█ If a city vacates a street or alley, it cannot extinguish the rights of ingress and egress for property owners abutting the public street or alley.[3] "Upon vacation of an alley by a city, abutting lot owners, as to that portion of the alley abutting their properties, are vested with a fee simple interest in one-half of the width of the strip of land which formerly comprised the alley * * * subject, however, to those rights which other owners may have in the alley as a necessary means of access to their properties."[4]

█ But a property must share a common border with a street to actually abut it.[5] In *Eastland Woods v. Tallmadge*, the appellant's property did not share

3. See *Taylor v. Carpenter* (1976), 45 Ohio St.2d 137, 74 O.O.2d 257, 341 N.E.2d 843; *Bayer v. N. College Hill* (1986), 31 Ohio App.3d 208, 31 OBR 478, 510 N.E.2d 400; *Ontario Stone Corp. v. Cleveland* (Feb. 3, 1994), Cuyahoga App. No. 64464, unreported, 1994 WL 30442; R.C. 723.08.

4. *Taylor, supra*, at syllabus.

5. *Eastland Woods v. Tallmadge* (1983), 2 Ohio St.3d 185, 2 OBR 726, 443 N.E.2d 972.

a common border with a vacated street that could have allowed access from the property to the street. The two properties merely touched at two points. The court held that the appellant's property did not abut the vacated street, and thus the appellant had no right to enjoin the street's vacation or to receive damages. A nonabutting landowner is not entitled to a portion of a vacated tract, nor is such a landowner entitled to damages when a municipality vacates a road.[6]

Like the appellant's property in *Eastland Woods*, the Nusekabels' property did not share a common border with Cormany Avenue, but only touched it along Marshall Avenue. Therefore, the Nusekabels' property did not abut Cormany Avenue, and the Nusekabels could not in law receive an ownership interest in the property or damages for its alleged vacation. We note that though the Nusekabels may not be able to obtain access to their parking lot, which has lain fallow for approximately ten years now, their property is not landlocked, as they have immediate access to Marshall Avenue, which abuts their northern border. Thus, the trial court erred in granting summary judgment to the Nusekabels and in granting half of an indeterminable amount of property to them. The first assignment is sustained.

### III.   Prescriptive Easement

In the second assignment, the defendants-appellants assert that the trial court erred in denying their motion for summary judgment because a municipality's property is not subject to a prescriptive easement. We agree.

▮▮▮▮ A plaintiff claiming a prescriptive easement must establish five elements: that the plaintiff used the property at issue (1) openly, (2) notoriously, (3) adversely to his neighbor's property rights, (4) continuously, and (5) for at least twenty-one years.[7] The plaintiff must prove these elements by clear and convincing evidence.[8] The owner of the servient property must dispel the claimant's proof that the usage was adverse to the servient owner's rights.[9] A use is not adverse if the landowner gave permission, for example, as a neighborly accommodation.[10] The distinctions between the elements of prescription and

---

**6.**   *In re Vacation of a Pub. Rd.* (1985), 18 Ohio St.3d 397, 18 OBR 449, 482 N.E.2d 570.

**7.**   *J.F. Gioia, Inc. v. Cardinal Am. Corp.* (1985), 23 Ohio App.3d 33, 23 OBR 76, 491 N.E.2d 325; *Martin v. Sheehy* (1986), 33 Ohio App.3d 332, 515 N.E.2d 1000.

**8.**   *Grace v. Koch* (Oct. 9, 1996), Hamilton App. No. C–950802, unreported, 1996 WL 577843; *McInnish v. Sibit* (1953), 114 Ohio App. 490, 19 O.O.2d 476, 183 N.E.2d 237; see, also, *J.F. Gioia, Inc., supra.*

**9.**   *J.F. Gioia, Inc., supra.*

**10.**   *McCune v. Brandon* (1993), 85 Ohio App.3d 697, 621 N.E.2d 434.

adverse possession seem limited to the land's actual occupation (which, in many cases, would transform a prescriptive-easement claim into an adverse-possession claim), and to the land's exclusive use. Unlike an adverse-possession claim, the element of exclusive possession of property is not required in a prescriptive-easement claim.[11]

There is no dispute that the city owned all the land that the apartment building's tenants had been using for access to the parking lot until 1986, when the city conveyed part of this land to Carlisle, which in turn conveyed it to the credit union in 1987. Thus, because of the twenty-one-year requirement, a prescriptive easement could have ripened only if it were obtainable against the municipality's property and the adverse use against the city could be tacked.

Though we have found no Ohio cases expressly prohibiting the acquisition of a prescriptive easement against a municipality by deciding that particular issue, several cases state that it is well settled that adverse possession cannot be applied against the state or its political subdivisions except as set forth by R.C. 2305.05.[12] R.C. 2305.05 provides an exception to a municipality's immunity from adverse possession of its streets and highways where a street or highway has not been open for public use and an adjoining property owner fences in the street or part of it and remains in open, uninterrupted use of the enclosed area for the twenty-one-year period. Of course, the Nusekabels never fenced in any part of Cormany Avenue and do not claim ownership of the property through adverse possession. But adverse possession and prescription are analogous doctrines requiring most of the identical elements and were created in the common law for the similar purpose of putting land to its highest and best use.

We also have found two Ohio cases, both from Cuyahoga County, that state that municipal corporations are not subject to property loss by adverse possession or prescription, but both cases turn on adverse possession.[13]

The modern cases state that adverse possession generally does not apply against municipalities, and they distinguish two Ohio Supreme Court cases that,

---

**11.** *Van Buren v. Worley* (Dec. 1, 1995), Lucas App. No. L–95–047, unreported, 1995 WL 704096; *Martin, supra,* citing *Pavey v. Vance* (1897), 56 Ohio St. 162, 46 N.E. 898; *Hahn v. Rideout* (Jan. 18, 1985), Ottawa App. No. OT–84–17, unreported, 1985 WL 8374; *Pennsylvania RR. Co. v. Donovan* (1924), 111 Ohio St. 341, 145 N.E. 479.

**12.** See *1540 Columbus Corp. v. Cuyahoga Cty.* (1990), 68 Ohio App.3d 713, 589 N.E.2d 467; *Wyatt v. Ohio Dept. of Transp.* (1993), 87 Ohio App.3d 1, 621 N.E.2d 822; *Chardon v. McGregor* (Nov. 10, 1994), Geauga App. No. 93–G–1817, unreported, 1994 WL 757926; *Bryan v. Killgallon* (Sept. 25, 1981), Williams App. No. WMS–81–6, unreported, 1981 WL 5791.

**13.** *1540 Columbus Corp., supra; LTV Steel Co. v. Cleveland* (Oct. 15, 1987), Cuyahoga App. No. 53827, unreported, 1987 WL 18489.

over a century ago, allowed adverse-possession claims against a municipality.[14] In *Cincinnati v. First Presbyterian Church* and *Cincinnati v. Evans,* adverse possession was granted against a municipality because large and valuable structures were built on the city's property, ruling out any possibility that the municipality permitted the encroachment. But the modern line of Ohio cases limits these cases to their facts—the erection of large and valuable structures— and seems to immunize municipalities from adverse possession.

Also limited to its facts is *Brown v. Monroeville Local School Dist. Bd. of Edn.*[15] In *Brown,* the Ohio Supreme Court applied adverse possession against property held in trust by a local board of education. But municipalities, which have more extended powers, cannot be equated with local school boards.[16] The modern trend in Ohio has been to shield municipalities from adverse possession and, we believe by analogy, from prescription.

We hold that the property of a municipality is not subject to prescription or adverse possession, except as specifically provided by R.C. 2305.05. We believe that a bright-line rule is preferable when property is affected. And adverse possession and prescriptive easements are disfavored in the law.[17] "Adverse possession has been considered by many judges and legal scholars, who, through their combined wisdom, have invented and perpetuated a system whereby an occupier of another's land obtains title to that land—but only if the occupation is wrongful."[18] Another Ohio court, rejecting a claim for a prescriptive easement, has written, "Society generally prefers that traditional recordable conveyances control the status of titles for real property interests."[19] And one law review article's writers have stated that prescriptive easements and

---

**14.** *Cincinnati v. First Presbyterian Church* (1838), 8 Ohio 298; *Cincinnati v. Evans* (1855), 5 Ohio St. 594.

**15.** *Brown v. Monroeville Local School Dist. Bd. of Edn.* (1969), 20 Ohio St.2d 68, 49 O.O.2d 347, 253 N.E.2d 767, limited by *Wyatt v. Ohio Dept. of Transp., supra,* and *1540 Columbus Corp. v. Cuyahoga Cty., supra.*

**16.** *Groveport Madison Local Edn. Assn. v. Groveport Madison Local Bd. of Edn.* (1991), 72 Ohio App.3d 394, 594 N.E.2d 994, citing *Finch v. Bd. of Edn.* (1876), 30 Ohio St. 37; *Bright Local School Dist. Bd. of Edn. v. Hillsboro School Dist. Bd. of Edn.,* (1997), 122 Ohio App.3d 546, 702 N.E.2d 449.

**17.** *Grace v. Koch, supra,* citing *Montieth v. Twin Falls United Methodist Church* (1980), 68 Ohio App.2d 219, 22 O.O.3d 346, 428 N.E.2d 870.

**18.** *Grace, supra,* citing Cunningham, Stoebuck & Whitman, The Law of Property (1984) 757, Section 11.7.

**19.** *J.F. Gioia, Inc.,* 23 Ohio App.3d at 37, 23 OBR at 80–81, 491 N.E.2d at 330.

adverse possession are "relics of the past" that reward the "theft of land." [20]

We also do not believe that a distinction based on whether a municipality uses the property for a proprietary or a governmental function is warranted in modern times. Undeveloped land is a precious commodity in today's crowded world, and a municipality should not lose its rights in a property, or the property itself, because it has not yet determined a suitable purpose for the land.[21] The public, for whom the municipality holds the property in trust, should not suffer for a government's negligence or inattention no matter what the land's purpose. Thus, it is unimportant to determine in what capacity the city held the land that borders the Nusekabels' property to the west.

The trial court correctly ruled on this issue, but fashioned another remedy that the parties did not seek, inappropriately precluding summary judgment for these defendants.

Applying this bright-line rule to the case *sub judice*, we are convinced that summary judgment must be granted to the defendants-appellants. The Nusekabels could not acquire a prescriptive easement on property that was wholly owned by the city for most of the twenty-one-year period required for prescription. This case serves as a reminder or example that, before purchasing property, buyers should visit the recorder's office and review the relevant public records.

We reverse the trial court's grant of summary judgment for the Nusekabels and instead grant summary judgment for the defendant-appellants.

*Judgment reversed*
*and final judgment*
*entered for appellants.*

SUNDERMANN and SHANNON, JJ., concur.

RAYMOND E. SHANNON, J., retired, of the First Appellate District, sitting by assignment.

---

**20.** See *Grace, supra,* citing William G. Ackerman & Shane T. Johnson, Outlaws of the Past: A Western Perspective on Prescription and Adverse Possession (1996), 31 Land & Water L.Rev. 79, 95, citing Section 1, Fourteenth Amendment to the United States Constitution.

**21.** See *Bryan v. Killgallon, supra.*